Gerald KOBELL, Regional Director of the Sixth Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner-Appellant,

v.

UNITED PAPERWORKERS INTERNATIONAL UNION, AFL-CIO, CLC, and its Constituent Local Unions, Erie Local 620, Local 14, Local 197; International Brotherhood of Firemen and Oilers, AFL-CIO, and its Constituent Local Union; and Local 246, International Brotherhood of Firemen and Oilers, AFL-CIO, Respondents-Appellees.

No. 91-6141.

United States Court of Appeals, Sixth Circuit.

Argued March 17, 1992.

Decided June 4, 1992.

Ellen A. Farrell, Deputy Associate Gen. Counsel, argued and briefed and Jayme L. Sophir, N.L.R.B., Office of the Gen. Counsel, Washington, D.C., for petitioner-appellant.

Lynn Agee, argued and briefed, and Michael Hamilton, United Paperworkers Intern. Union, Nashville, Tenn., for defendants-appellees.

Andrew E. Zelman, argued and briefed, New York City, for amicus curiae.

Before: GUY and RYAN, Circuit Judges; and JOINER, Senior District Judge.*

JOINER, Senior District Judge.

The Regional Director (Director) of the National Labor Relations Board (NLRB) appeals from an order of the district court denying temporary injunctive relief sought under section 10(j) of the National Labor Relations Act (NLRA) as amended, 29 U.S.C. § 160(j) (1982), pending the NLRB's determination of charges of unfair labor practices. We find that the district court erroneously concluded that the Director failed to demonstrate reasonable cause for injunctive relief. We find that issuance of an injunction would be just and proper. Therefore, we reverse, and remand the action to the district court with instructions

that the injunctive relief sought by the Director immediately issue.

## I.

This action was brought against the United Paperworkers International Union and three of its Locals (Union), as well as the International Brotherhood of Firemen and Oilers and one of its Locals.[1] The underlying unfair labor practice action was initiated by the International Paper Company (Company) when it filed charges with the NLRB between June 26, 1990, and July 20, 1990. The charges were based upon the Union's adoption of a pooled voting contract ratification procedure. In the period between entry of the order now appealed and oral argument before this court, an administrative law judge (ALJ) of the NLRB determined that implementation of the pooled voting ratification procedure is violative of sections 8(b)(3) and 8(d) of the NLRA. The district court relied upon the testimony heard by the ALJ and upon documents submitted. These sources reveal the following facts.

The Company conducts paper manufacturing operations at approximately 200 locations in 35 states. The Union represents Company employees at 66 of those sites. The parties have collectively bargained for approximately 50 years. Prior to 1984 the employees of the 66 facilities were represented in two large units, called multiples. Through collective bargaining, the parties agreed to break up the multiples and, since 1984 the contract negotiations have proceeded at the Local level. In 1985, the Company injected proposed changes in benefits into the bargaining process, notably the elimination of automatic Sunday "premium pay," if the Sunday fell within an employee's regular 40–hour week, and changes in work rules. The Union resisted these changes and strikes were called by

---

* The Honorable Charles W. Joiner, United States District Court for the Eastern District of Michigan, sitting by designation.

1. The International Brotherhood of Firemen and Oilers has been characterized in this case as an "incidental" defendant because that union shares bargaining rights with the United Paper-

workers International Union at one of the locations involved in the underlying unfair labor practices case. The Unions are referred to in the singular (Union) as the implementation of a ratification procedure by the United Paperworkers International Union is the crux of this case.

the Union at three of the Company's facilities. The result of the strikes has been the permanent replacement of approximately 2200 strikers.

Unable to obtain its objectives by striking the Company at individual Locals, the Union amended section 4 of article XV of its constitution with the purpose of creating an alternative economic weapon. Section 2 of article XV of the constitution states that: "Negotiations for collective bargaining agreements shall be subject to supervision by, and their terms, conditions and termination shall be subject to the approval of the International President." Thus, it has always been within the authority of the International President to approve or disapprove of an agreement reached between a Local and the Company. There was testimony before the ALJ that, in practice, the International President consistently approved of agreements reached at the Local level. Section 4 of article XV was amended to read:

In some instances, Locals may choose to engage in coordinated bargaining to enhance their bargaining strength. In order to assure that bargaining is meaningful and orderly, it will be necessary to allow pool voting with the supervision of the President under Article XV, Section 2 of the UPIU Constitution. Should a group of Locals choose this course of action, the following procedures shall apply:

1) Participating Locals shall announce their commitment to allow their votes on a collective bargaining agreement to be pooled with other Locals making the same commitment.

2) The Locals shall agree on major issues they wish to pursue in collective bargaining.

3) Each Local will continue its independent decision making in their separate bargaining units.

4) Votes taken on contract proposals will be tallied at each location. The results will then be sent to the International President who will tally the pooled votes.

The existence of a contract will be governed by Article XV, Section 1 of the Constitution.

The purpose of the pool procedure was stated by the Union as two-fold: (1) to obtain common contract expirations within a recognized pool and (2) to resist concessions. The Union's vice president testified that he declared the pool to be in effect in March 1990. By August 1991 over 20 Locals had joined the pool.

The operation of the voting pool is not completely described in the constitution, but explanatory documents disseminated to Locals in order to encourage their participation in the voting pool provide details:

Under pool voting, local unions voluntarily agree to allow their votes on a contract at their location to be pooled with the votes of other local unions who have joined the pool. After voting, the ballots are sent to the UPIU International President who will tally the votes from all locations in the pool. The contract at any one location is considered ratified only if there is a vote in favor of ratification by a majority of all votes cast in the pooled locals.

In other words, the existence of a contract at any Local is dependent upon the ratification of contract proposals by a majority of those voting in the pooled Locals. Even though one Local may have voted to accept a proposal, failure of a majority "yes" vote within the pool would mean that no contracts would be ratified at *any* Local within the pool. The Locals were advised by the Union that, upon the completion of voting on a contract proposal, the tallies for the Local should be sent only to the International Union and that the Local should not reveal to the Company the results of the vote. The Union asserts that inclusion within the pool was entirely voluntary. However, it is not clear that Locals had the same flexibility to leave the pool as to join it. Explanatory documents state that a Local may leave the pool "only with the agreement of the other local unions participating in the pool."

The course of bargaining between the Locals and the Company has been signifi-

cantly affected by implementation of the pooled voting procedure. The expiration dates of contracts between the Company and individual Locals had been staggered, and bargaining for new contracts proceeded to votes at individual Locals at different times.[2] By July 1990 three Locals had voted on contracts. These were Local 14, representing employees at the Company's Androscoggin mill in Jay, Maine; Local 620 representing employees at the Company's Erie mill in Erie, Pennsylvania; and Local 197 representing employees at the Company's Strathmore mill in Westfield, Massachusetts.

On March 12, 1990, the Company was informed by officials of Local 14 that the ballots had been sent to the International President in accordance with the pool procedure, and that there could be no contract until the pooled votes were tallied. From that date bargaining ceased at the facility. Voting at the Erie and Strathmore facilities resulted in the acceptance and rejection of Company proposals respectively. Although the Locals had been instructed not to inform the Company of the results of the voting, this direction was not followed. However, the Locals did transmit their ballots to the International President who, in accordance with the pool procedure, would not approve of the agreement reached at the Erie facility until all votes taken within the pool were tallied. Bargaining also ceased for these facilities.

This pattern of bargaining to the point of a vote, followed by the cessation of all bargaining, was repeated at a number of Locals within the pool. At the time of the Director's petition, the results of voting at two facilities were unknown. At three facilities, Local members voted to reject Company offers and negotiations were not resumed. At other facilities, bargaining ceased prior to tender of a final offer because bargaining could not yield a contract until the tally of all pool votes. The result of the pool, as of the time of the filing of

this appeal, has been to frustrate the implementation of agreements ratified by individual Locals or to preclude additional bargaining at facilities which have rejected proposals or at those facilities where the results of balloting are unknown.

## II.

The NLRB issued complaints on the Company's unfair labor practices charges which were heard by the ALJ in May 1991. The complaints alleged that the Union had violated sections 8(b)(3) and 8(d) of the NLRA by refusing to bargain in a diligent and timely manner and by conditioning an agreement at a given bargaining unit on matters extraneous to that bargaining unit. Pending resolution of the agency action, the Director brought a section 10(j) petition to the district court seeking to enjoin operation of the pool procedure. Specifically, the Director sought an order commanding the International President's approval of the contract which had been ratified by Local 620, and approval of contracts ratified by Locals at any other Company facility. The district court considered the petition under the appropriate two-prong test and determined that there was no reasonable cause for injunctive relief and that the same would not be just and proper. The district court primarily based its conclusion on the presumed novelty of the Director's complaint regarding the pooled voting procedure by reasoning that to enjoin use of the pool procedure prior to a determination of its invalidity would have the effect of usurping the ALJ's role. The Director filed the instant appeal on September 23, 1991, and subsequently requested and was granted an accelerated hearing date.

The ALJ filed a decision on December 17, 1991. Following an exhaustive review of the testimony, the ALJ concluded that the pooled voting procedure was violative of the NLRA for the reasons asserted in the complaints. The order recommended by

---

2. At the time the pool was declared in March 1990, the earliest date at which a tally of all votes within the pool could have been conducted was January 1993, the latest expiration date of a contract then in force between the Compa-

ny and one of the Locals understood to have included itself within the pool. At some point in late 1990 or early 1991 the Union decided that in December 1991 a tally would be made of all the votes taken by Locals as of that date.

the ALJ directs the Union to (1) rescind the amendment to article XV of its constitution; (2) execute a written contract with the Company at the Erie facility embodying the proposal ratified by the membership of Local 620; (3) immediately tally the ballots cast in the ratification vote conducted among the members of Local 14 at the Androscoggin facility and, if appropriate, execute a written contract and; (4) immediately tally the ballots cast in the ratification vote conducted among the members of Local 197 at the Strathmore facility and, if appropriate, execute a written contract. The Union filed exceptions to the ALJ's decision with the Board on February 6, 1992. Therefore, the ALJ's recommended order has no enforceable effect unless and until it is adopted by and becomes the order of the Board. 29 C.F.R. § 101.11(b).

On March 16, 1992, the Union filed a motion to dismiss the Director's appeal on the grounds that it had been rendered moot by the Union's February 18, 1992, voluntary discontinuation of the pooled voting ratification procedure. With the exception of the Erie unit, the Union has now signed agreements covering all pool units that had voted to ratify final offers made by the Company. Also on February 18, 1992, the Union established a "coordinated bargaining pool." This pool does not operate in the same fashion as the ratification voting pool. Instead, it is an agreement among pool member Locals that the International President may refuse to sign any contract offer that does not contain language recognizing the right of Union members to honor the pickets of other unionized workers. The coordinated bargaining pool forms no part of the controversy before this court. However, as we address in detail *infra*, the Union's suggestion that this appeal is moot is not correct because the relief sought by the Director has not been realized. We now turn to the question of whether that relief should have been granted.

### III.

 In most circumstances labor disputes are resolved through administrative procedures and, when necessary, enforced by the courts of appeals. Administrative review is often slow therefore, interim injunctive relief occasionally may be necessary to preserve the remedial power of the Board. For such cases, Congress has provided the Board with the ability to petition the district court to enjoin allegedly unfair labor practices pending the Board's substantive review of those practices. *See Arlook v. S. Lichtenberg & Co.*, 952 F.2d 367, 369 (11th Cir.1992). Authorization for injunctive relief is found at §§ 10(j) and 10(*l*) of the NLRA. Section 10(j) was added to the NLRA in order to provide the Board with "a means of preserving the status quo pending the completion of its regular procedures." *Levine v. C & W Mining Co.*, 610 F.2d 432, 436 (6th Cir.1979). Although the instant case involves a petition under section 10(j), citation to cases involving either provision is appropriate as the same standards apply. *Gottfried v. Sheet Metal Workers Int'l, Local 80*, 927 F.2d 926, 927 (6th Cir.1991). Before the district court may order temporary injunctive relief under section 10(j), it must make two findings. It must first determine that there is reasonable cause to believe that the alleged unfair labor practices have occurred and, if reasonable cause is found, it must determine whether injunctive relief is just and proper. A negative answer to either inquiry must result in denial of the petition. *Fleischut v. Nixon Detroit Diesel, Inc.*, 859 F.2d 26, 29 (6th Cir.1988). We address in turn the district court's negative finding on each question.

### A.

 Review of the district court's finding on the reasonable cause portion of the section 10(j) petition is a review of mixed questions of law and fact. *Nixon Detroit Diesel*, 859 F.2d at 29. The reasonable cause analysis is sub-divided into two queries. The first query involves the theory of the Director in requesting relief. To establish reasonable cause the Director bears a "relatively insubstantial" burden. *Gottfried v. Frankel*, 818 F.2d 485, 493 (6th Cir.1987). To satisfy that burden the Di-

rector must produce some evidence in support of the petition and "need not convince the court of the validity of the Board's theory of liability, as long as the theory is substantial and not frivolous." *Id.* This question is essentially one of law, and, in answering the question, a district court "need not concern itself with resolving conflicting evidence if facts exist which could support the Board's theory of liability." *Nixon Detroit Diesel*, 859 F.2d at 29. Therefore, if we find that the district court erroneously concluded that the Director's legal theory was insubstantial, we may reverse the district court's finding that no reasonable cause existed. *Id.* The second query is whether the facts satisfy the Director's theory. This is "largely a factual question." *Id.* (citing *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1085 (3d Cir. 1984)). Therefore, if we were to conclude that the district court correctly determined the substantiality of the Director's legal theory, our subsequent review of the district court's finding of facts and its determination whether those facts satisfy the Director's theory permits reversal only if such fact-finding was clearly erroneous. *Id.*

■ We resolve the reasonable cause question in this case by finding that the district court erred in determining that the Director's legal theory was insubstantial. We do so noting that the district court misapprehended the standard by which it was to judge the reasonable cause prong of the Director's petition. The court stated:

> This Court's function on the reasonable cause prong of the *Gottfried [v. Frankel*, 818 F.2d 485 (6th Cir.1987)] test is to determine whether, in light of a tangled web of facts, the Board's theory has merit. It clearly falls within the ALJ's purview to rule on the ultimate validity of the NLRB's argument. The ALJ has heard the facts and judged the credibility of the witnesses. Eighteen hundred pages of testimony have been adduced and transcribed. Both the Union and the IP make persuasive arguments for their respective positions. However, as will be discussed more fully under the "just and proper" second

prong of the *Gottfried* test, to issue an injunction would be to grant the ultimate relief of changing the union practice without having the benefit of those factual and credibility determinations. Based on the information before it, this Court is unable to find "reasonable cause" to believe that a violation has occurred.

The merit the district court searched for was only to determine whether the Director had advanced a legal theory that was substantial and not frivolous. *Frankel*, 818 F.2d at 493. We reemphasize our directive that in answering this question the district court need not resolve conflicts within "a tangled web of facts." *Nixon Detroit Diesel*, 859 F.2d at 29. The question is one of law, and we turn to the legal support offered by the Director.

Section 8(d) of the NLRA, 29 U.S.C. § 158(d), obligates employers and unions to bargain collectively "in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party...." Section 8(b)(3) of the NLRA states that a labor organization commits an unfair labor practice when that organization refuses to bargain collectively with an employer. 29 U.S.C. § 158(b)(3). It is the Director's theory that the International President's refusal to approve the contract ratified by the Erie Local members is a violation of the Union's statutory duties. That refusal, and the categorical refusal to approve any agreement pending tally of all balloting within the pool, is alleged to be not only an unlawful refusal to implement a validly bargained agreement, but conditions the approval of any bargained-for agreement upon matters extraneous to the individual Local unit with which the Company is bargaining. Further, the pool procedure completely frustrates the continuation of the bargaining process and thus constitutes an unlawful delay.

Well-established principles of labor law support the Director's theory, providing an ample basis to conclude that the theory is substantial. Three theories of violation, each of which have been addressed by the Board and the courts, are intertwined in the Director's petition: (1) failure to execute a ratified contract, (2) the attempted expansion of bargaining power beyond the appropriate bargaining unit, and (3) undue delay in bargaining.

The duty to bargain collectively and in good faith includes the duty to execute agreements once they have been reached. *H.J. Heinz Co. v. NLRB*, 311 U.S. 514, 525–26, 61 S.Ct. 320, 325–26, 85 L.Ed. 309 (1941); *Adams Potato Chips, Inc., v. NLRB*, 430 F.2d 90, 91–92 (6th Cir.1970), *cert. denied*, 401 U.S. 975, 91 S.Ct. 1194, 28 L.Ed.2d 324 (1971); *Standard Oil Co. v. NLRB*, 137 N.L.R.B. 690 (1962), *enforced*, 322 F.2d 40, 45 (6th Cir.1963). This is a rule of long standing, and the Union has failed to present persuasive argument to the contrary. The Union relies upon the authority of the International President to approve or withhold approval of agreements at the Local level, arguing:

> The President has simply declined immediate approval at each location due to the concessions contained in the final offer *at the individual location.* He will ultimately decide upon final approval based upon the pooled tally outcome. The pooled vote signals the President as to which, if any, concessions the membership are willing to tolerate. However, it is still the President's final authority which will determine which are executed.

This argument is disingenuous, neatly sidesteps the pool-wide impact of the pooled voting procedure, and mischaracterizes the scope of the International President's authority to withhold approval of ratified agreements. While the International President has the authority to withhold approval of agreements on the basis of specific contract terms found to be unacceptable, he may not inject into the determination of approval issues which are extraneous to bargaining in the individual bargaining unit. *Standard Oil Co.*, 322 F.2d at 45; *Local 850, Brotherhood of*

*Painters, Decorators, and Paperhangers of America*, 177 N.L.R.B. 155, 157 (1969). Here, we find that the International President has not withheld approval expressly or entirely upon dissatisfaction with contract terms. Rather, under the dictates of the pool procedure, he has conditioned his eventual response to the Erie agreement on the results of voting in other discrete bargaining units. Along with constituting a failure to execute a ratified agreement, this is arguably an attempt to expand the bargaining power of the Union beyond the appropriate bargaining unit. This court previously enforced a Board determination of an unfair labor practice based upon such an attempt, stating our agreement with the Board's legal conclusion that

> because the Unions knew that the withholding of approval by the International and the Council was unrelated to any dissatisfaction with the contract terms themselves but was based upon the unilateral decision to approve no agreement with the Company until negotiations were satisfactorily concluded by another local at the Company's Toledo unit, the delay was unlawful. The logic of the Board in support of this conclusion is that the Toledo issue was an extraneous matter imposed upon the Company after agreements had been reached at Cleveland and Lima.

*Standard Oil Co.*, 322 F.2d at 45. In this case, bargaining was carried on at the individual Local level. While the parties may bargain to a new definition of the applicable bargaining unit, no bargaining on this topic is alleged to have occurred.

Finally, the Director persuasively argues that section 8(d)'s command to bargain collectively and in good faith implicitly contains a proscription against undue delay. Section 8(d) sets forth the "mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith ..." regarding mandatory subjects of bargaining. Dilatory or evasive tactics have been considered by the Board as indicative of bad faith. *Lloyd A. Fry Roofing Co. v. NLRB*, 216 F.2d 273, 275 (9th Cir.1954); *Little*

*Rock Downtowner,* 145 N.L.R.B. 1286, 1305, *modified on other grounds,* 341 F.2d 1020 (8th Cir.1965). In this case, the district court heard testimony that implementation of the pooled voting procedure did not simply slow the bargaining process but brought that process to a standstill within numerous bargaining units. Under the pool procedure all bargaining is halted within a bargaining unit once a vote is taken within that unit on a final offer. The results of the vote may not be known for months or years pending the completion of voting at all Locals within the pool. Therefore, there is no basis for the continuation of discussions on any possible points of disagreement. In the case of the Erie Local, the district court heard testimony that the effect of the pool procedure has been the absence of collective bargaining between the Company and the Local since the Company presented a final offer on June 5, 1990. Such extensive delay is contrary to the recognized purposes of the collective bargaining process. The Supreme Court has held that the Board has the authority to order the cessation of unilateral action "which is in effect a refusal to negotiate, or which directly obstructs or inhibits the actual process of discussion, or which reflects a cast of mind against reaching agreement." *NLRB v. Katz,* 369 U.S. 736, 747, 82 S.Ct. 1107, 1114, 8 L.Ed.2d 230 (1962). Because the pooled voting procedure is effectively a unilateral decision to halt collective bargaining, that procedure arguably undermines the duty imposed upon parties to collective bargaining to seriously "attempt to resolve differences and reach a common ground." *NLRB v. Insurance Agents' Union,* 361 U.S. 477, 486, 80 S.Ct. 419, 425, 4 L.Ed.2d 454 (1960). The Union's attempt to cast the delay inherent to the pooled voting procedure as the result of legitimate disagreement over specific contract terms is not sufficient to avoid the fact that bargaining at individual units ceases entirely pending the protracted pool voting process.

It is not our task to make a final determination on the merits of the Director's theory. We find that the theories advanced are not novel, but are constructed of issues of labor law which have been addressed by the Board and by this and other courts. We also find the Director's theory to be substantial rather than frivolous and that reasonable cause for injunctive relief was presented to the district court. *Nixon Detroit Diesel,* 859 F.2d at 30.

### B.

▮▮▮ We now turn to the question whether such injunctive relief would be just and proper.[3] The district court found that injunctive relief was not appropriate, stating:

Viewing the arguments of both parties, the Court finds that an injunction in this case would not be "just and proper." Although the pooling method has resulted in some delay and uncertainty, the Court feels that this does not amount to a termination of negotiations. Further, the Court is impressed with the Second Circuit's reasoning [*Silverman v. 40–41 Realty Assoc.,* 668 F.2d 678 (1982) ] with respect to novel legal issues. Even though a decision either way will affect the ultimate validity of the pool, the Court is convinced that enjoining it before a final ruling will destroy the advantage gained by it should the ALJ find it permissible. In contrast, the Board concedes that the bulk of the harm it faces—a large scale strike and rejection of otherwise ratified contracts—lawfully could occur even if an injunction were granted. After balancing the somewhat speculative relative harms that might occur before the ALJ renders an opinion, this Court cannot say that the public interest would be served by injunctive relief.

The just and proper determination is committed to the discretion of the district court. *Frankel,* 818 F.2d at 494. Therefore, this court asks whether the refusal to

---

**3.** In section 10(j), Congress authorized injunctive relief upon a showing that such relief is just and proper and not upon the traditional, more stringent requirement of irreparable harm. *Nixon Detroit Diesel,* 859 F.2d at 30, n. 3.

grant injunctive relief constitutes an abuse of that discretion. *Nixon Detroit Diesel,* 859 F.2d at 30 (citing *Sheeran v. American Commercial Lines, Inc.,* 683 F.2d 970 (6th Cir.1982)). An abuse of discretion is found only when the district court "relies upon clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard." *Id.* Although we recognize the deferential nature of this standard of review, we find that an abuse of discretion has occurred in this case.

■ In determining whether injunctive relief is just and proper, the legal standard a district court must apply is whether such relief is "necessary to return the parties to status quo pending the Board's proceedings in order to protect the Board's remedial powers under the NLRA, and whether achieving status quo is possible." *Frankel,* 818 F.2d at 495. Just as this court found in *Nixon Detroit Diesel,* we now find that the district court failed to address the appropriate question.

First, the district court's concern that injunctive relief could prematurely strip from the Union a bargaining advantage gained over the Company by virtue of the pooled voting procedure has no bearing on the necessity or possibility of returning the parties to status quo. That condition is defined as that existing *prior* to the adoption of the allegedly unfair labor practice. *Sheet Metal Workers Int'l, Local 80,* 927 F.2d at 928 (citing *Levine v. C & W Mining,* 610 F.2d 432, 436 (6th Cir.1979)). Nor does the district court's order recite a consideration of the necessity of injunctive relief to protect the remedial powers of the Board, other than to state that such relief would not be in the "public interest" given the "somewhat speculative relative harms that might occur before the ALJ renders an opinion." We find this statement to be but a conclusory adoption of technical language which ignores both the fact of concrete harm inflicted by the Union's refusal to approve the ratified Erie agreement, and the nature of the administrative process. The decision of the ALJ is not binding and does not resolve the case when, as in this case, objections have been filed. 29 C.F.R.

§ 101.11(b). In this regard we find errors of fact and law.

■ Second, as discussed in review of the reasonable cause inquiry, we do not find the Director's theory of liability to be novel. Neither do we agree that the Second Circuit precedent on the propriety of injunctive relief sought upon a novel legal theory supports the conclusion of the district court. Second Circuit jurisprudence on section 10(j) relief has developed to reflect some reluctance to grant that relief. *See McLeod v. General Electric,* 366 F.2d 847, 849 (2d Cir.1966), *vacated as moot,* 385 U.S. 533, 87 S.Ct. 637, 17 L.Ed.2d 588 (1967) *(per curiam).* In *Silverman v. 40–41 Realty Associates, Inc.,* 668 F.2d 678, 680 (2d Cir.1982), the court concluded that injunctive relief could not be just and proper where the legal theory advanced by the petitioner involves an "unprecedented application of the Act," or where the issue in a given case is "a difficult one that had not been considered by any court." *Id.* (citation omitted). However, the court found that section 10(j) relief is appropriate in cases where "the prevailing legal standard is clear and the only dispute concerns the application of that standard to a particular set of facts." *Id.* at 681.

The Director's theory in the case before us is premised upon well-established legal principles, and calls only for a determination by the Board whether the pooled voting procedure is violative of those principles. We do not undertake to reconcile Second Circuit precedent with our own as we conclude that the district court's reliance upon that precedent was misplaced in the context of the theories and facts presented. The district court's improper application of the law to the just and proper inquiry constitutes an abuse of discretion. *Nixon Detroit Diesel,* 859 F.2d at 30.

Based on the record, we find that the requested injunctive relief would return the parties to the status quo and protect remedial powers of the Board.

## C.

■ Finally, we turn to the Union's assertion that this action has been rendered moot by the Union's February 18, 1992,

voluntary abandonment of the pooled voting procedure. We conclude that the Union's action has not mooted the controversy.

The Director petitioned the district court for an order enjoining the Union from refusing, by virtue of the dictates of the pooled voting procedure, to approve collective bargaining agreements that have been ratified at the Local level, whether at the Erie facility or any other facility. To date, the contract ratified by the Erie Local members has yet to be approved. This fact alone strongly militates against a finding that the Union has ceased to engage in the suspect procedures attendant to the pooled voting scheme.

A party seeking dismissal on the basis of mootness bears a "heavy burden of persuasion." *United States v. Phosphate Export Ass'n*, 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968). To meet that burden a party must demonstrate that it is "'*absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recure.'" *Gwaltney v. Chesapeake Bay Foundation*, 484 U.S. 49, 66, 108 S.Ct. 376, 386, 98 L.Ed.2d 306 (1987) (emphasis in original; quoting *Phosphate Export Ass'n*, 393 U.S. at 203, 89 S.Ct. at 364). In the case before us the alleged unfair labor practice could recur, although that question is somewhat premature as the alleged unfair labor practice, insofar as that practice includes refusal to approve the Erie agreement, has yet to cease. Further, the Union is currently pressing its exceptions to the ALJ's order before the Board. It is not an answer to this action that the ALJ has entered an order directing that the Erie agreement be ratified. The ALJ's order is but a recommendation, pending the Board's resolution of the Union's exceptions to that order.

In sum, we find that the Erie agreement still has not been approved and that this failure may be viewed under applicable precedent as a violation of the Union's duty to bargain collectively and in good faith. *H.J. Heinz Co.*, 311 U.S. at 525–26, 61 S.Ct. at 325–26. As such, this circumstance is sufficient to support a petition for injunctive relief. *Nixon Detroit Diesel*, 859 F.2d

at 30. Therefore, we hold that the Union has failed to bear its heavy burden of demonstrating mootness and this action remains a live controversy pending the Board's resolution of the underlying unfair labor practice dispute.[4] This circuit has noted before that the appellate courts have not been reluctant to issue injunctions under section 10(j), and we are presented with no reason not to direct the appropriate injunctive relief here. *See, Sheet Metal Workers Int'l, Local 80*, 927 F.2d at 928.

We REVERSE the district court's order denying the Director's petition and that order shall be VACATED. This action is REMANDED to the district court with instructions to enter the injunction sought by the Director. The term of injunctive relief shall be through the termination of the Board's proceedings on the underlying unfair labor practices action or until facts are shown to indicate that the injunction would no longer be valid or equitable. *Nixon Detroit Diesel*, 859 F.2d at 31.

---

4. The Union has adopted a new ratification procedure which it calls a coordinated bargaining pool. At oral argument, counsel for the Company and the Director stated that this new procedure is not being challenged in the instant action.