10 F.3d 1221
 145 L.R.R.M. (BNA) 2026, 127 Lab.Cas. P 10,951
 D. Randall FRYE, Regional Director of the Ninth Region of
the National Labor Relations Board, for and on
behalf of the NATIONAL LABOR RELATIONS
BOARD, Petitioner-Appellant,
v.
SPECIALTY ENVELOPE, INC., Respondent-Appellee.
 No. 93-3339.
 United States Court of Appeals,
Sixth Circuit.
 Argued Sept. 24, 1993.
Decided Oct. 14, 1993.*
 
 Linda M. Kirchert, N.L.R.B., Office of Gen. Counsel, (argued), Ellen A. Farrell (briefed), Dep. Asso. Gen. Counsel, Corinna L. Metcalf, N.L.R.B., Washington, DC, for plaintiff-appellant.
 David K. Montgomery, Keating, Muething & Klekamp, Cincinnati, OH (argued and briefed), for defendant-appellee.
 Before: KENNEDY and RYAN, Circuit Judges; and BROWN, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 D. Randall Frye, the Regional Director ("Director") of the Ninth Region of the National Labor Relations Board ("NLRB" or "the Board"), appeals on behalf of the Board from an order of the District Court denying temporary injunctive relief sought under section 10(j) of the National Labor Relations Act ("NLRA" or "the Act"), 29 U.S.C. Sec. 160(j), pending final outcome of Board proceedings on unfair labor practice charges. The Director argues that the District Court erred in denying its motion without using the well-established standards this Circuit employs when analyzing a section 10(j) motion. We agree.
 
 I. Background
 
 2
 A. Western Paper Products, Inc.
 
 
 3
 Specialty Envelope, Inc. ("Specialty"), defendant in the underlying unfair labor practice proceeding and respondent in the present appeal, is a manufacturer of envelopes, located in Cincinnati, Ohio. Specialty began its operations in 1992 when it purchased the assets of Western Paper Products, Inc. ("Western"), d/b/a Specialty Envelope Company, from a state court receiver. Western employees had been represented by the United Paperworkers International Union and its Local 459 ("the Union") under collective bargaining agreements ("CBA"), the last one negotiated effective December 10, 1990 through November 20, 1993.
 
 
 4
 Western began experiencing financial difficulties, which became severe. In November of 1991, Western ceased paying the health insurance premiums for all employees and stopped making pension contributions for bargaining unit employees, in contravention of the CBA. By January of 1992, Western had defaulted on its loan payments to its primary creditor, Central Trust Company. On January 9, 1992, Central Trust called in its loan and Western was forced to close its doors.
 
 B. Receivership
 
 5
 On January 13, 1992, by order of the Court of Common Pleas of Hamilton County, Samuel L. Peters was appointed receiver of Western's assets, at the request of Central Trust. Peters was given control of the facility's day-to-day operations, with an eye towards selling Western's assets. Western's employees, who had been sent home on January 9th, returned to work. During the receivership, Peters refused to honor the existing labor agreement and made unilateral changes in working conditions and employee benefits that were inconsistent with the CBA. Peters did not recognize or bargain with the Union, nor did he honor its requests for information. In February 1992, a majority of employees signed a decertification of union representation petition.
 
 
 6
 C. Specialty Envelope, Inc.
 
 
 7
 In March of 1992, Peters incorporated Specialty Envelope, Inc. for the purpose of purchasing Western's assets. Peters is president and sole shareholder of Specialty. On June 19, 1992, the court approved the sale of Western's assets to Specialty. By September 8, 1992, the purchase of assets was complete, and all proceeds of the sale went to Central Trust. All of Western's employees filled out employment application forms and were hired by Specialty. Specialty declined to honor the CBA and continued the unilateral changes Peters had implemented.
 
 D. Procedural Background
 
 8
 The Union filed unfair labor practice charges against Western, both before and after it went into receivership, and against Specialty, for refusing to bargain with the Union, failure to honor information requests and making unilateral changes in working conditions. The charges against Specialty were filed in November 1992, after fruitless settlement negotiations.
 
 
 9
 On December 22, 1992, the Board issued a consolidated complaint against Western and Specialty. A hearing on the consolidated complaint was held in March 1993. A motion by the Board to amend the charges to include charges against the receiver was denied.[1]
 
 
 10
 On February 3, 1993, the Board filed a section 10(j) petition[2] with the District Court for a temporary injunction requiring Specialty to, inter alia, recognize and bargain with the Union pending resolution of the administrative proceedings before the Board. On February 19, 1993, the Director moved the District Court to admit the transcript of the proceedings before the ALJ in lieu of oral testimony in the district court to support its petition. After the conclusion of the hearing before the ALJ on March 2, the Director renewed his motion. On March 12, 1993, the District Court held a hearing on the Director's motion. At the hearing, the district judge indicated that he did not believe it was the role of the District Court to intervene in labor disputes, section 10(j) notwithstanding. The court did not take any evidence at the hearing, did not rule on the Director's motion, although it indicated that it would deny the petition.
 
 
 11
 On March 16, 1993, the District Court issued a written order denying the Board's petition. The Board timely appealed. On April 13, 1993, the Board filed an Emergency Motion for Injunction Pending Appeal and to Expedite Appeal with this Court. We granted the motion to expedite, but declined issuance of an injunction pending the appeal.
 
 II.
 
 12
 In its written order, the District Court recognized that section 10(j) empowers the Board to seek temporary relief from the District Court pending administrative proceedings, however, it proceeded to deny the petition under traditional preliminary injunction standards. The court reasoned that because the matter was pending before the ALJ, the Board could not establish that it did not have an adequate remedy at law. The court also found that the Board had failed to establish irreparable harm. Under section 10(j), the Board is not required to make either of these showings. Nowhere in its order does the District Court make reference to, much less utilize, the well-established standards used to review petitions for temporary injunctive relief under section 10(j) in this Circuit.
 
 
 13
 In this Court's decision in Fleischut v. Nixon Detroit Diesel, Inc., 859 F.2d 26 (6th Cir.1988), we explained the nature of section 10(j) relief.
 
 
 14
 At the outset we note that section 10(j) proceedings are merely ancillary to unfair labor practice proceedings to be conducted before the Board. The district courts in their analysis under 10(j) are not to adjudicate the merits of the unfair labor practice case. The question of whether a violation of the Act has been committed is a function reserved exclusively to the Board, subject to appellate court review of final Board orders. Section 10(j) reflects Congress' view that interim injunctive relief to restore and preserve the status quo, pending final Board adjudication, may be required to avoid frustration of the basic remedial purposes of the Act and possible harm to the public interest.
 
 
 15
 Id. at 28-29 (citations omitted).
 
 
 16
 To award injunctive relief under section 10(j), the district court must make two findings. First, the court must find that there is "reasonable cause" to believe that the alleged unfair labor practice has occurred. Second, if such reasonable cause is found to exist, the court must then determine whether injunctive relief is "just and proper." Kobell v. United Paperworkers Int'l Union, 965 F.2d 1401, 1406 (6th Cir.1992); Nixon Detroit Diesel, 859 F.2d at 29; Gottfried v. Frankel, 818 F.2d 485, 493 (6th Cir.1987).
 
 
 17
 The Board is entitled to have its petition considered under the appropriate standards. Specialty urges this Court to remand the case to the District Court for reconsideration. The Director argues that this Court need not remand, but may itself decide whether temporary relief should be granted. Under the precedent in this Circuit and the circumstances of this case, we believe that the Board has the better argument.
 
 
 18
 In Gottfried v. Sheet Metal Workers International, Local 80, 927 F.2d 926 (6th Cir.1991), we encountered a situation much like the present one in which the district court failed to apply the appropriate standards to a section 10(j) petition. We reversed the denial of the petition for the court's failure to follow the appropriate two-part analysis. We then conducted our own analysis, in lieu of remanding the case to the district court, and determined that a preliminary injunction should issue. In doing so we noted:
 
 
 19
 [A]ppellate courts have not been reluctant to direct district courts to issue injunctions under Secs. 10(j) and 10(l ). See, for example, Kaynard v. Independent Routemen's Association, 479 F.2d 1070, 1073 (2d Cir.1973); Sachs v. Local Union No. 48, 454 F.2d 879, 883 (4th Cir.1972). Otherwise, the time that passes while a given case is pending on remand "more than likely [ ] will greatly diminish the curative effect of the relief." Maram v. Universidad Interamericana de Puerto Rico, Inc., 722 F.2d 953, 960 (1st Cir.1983). We see no reason not to direct issuance of the appropriate injunction here.
 
 
 20
 Sheet Metal Workers, 927 F.2d at 928. See also, United Paperworkers, 965 F.2d at 1407-11 (where district court "misapprehended" the "reasonable cause" standard and "failed to address the appropriate question" in the "just and proper" inquiry, this Court analyzed the Board's petition and directed that appropriate injunctive relief be granted); Pascarell v. Vibra Screw, Inc., 904 F.2d 874 (3d Cir.1990) (district court misinterpreted "just and proper" standard and did not perform "reasonable cause" inquiry; Third Circuit refused to remand to district court for "reasonable cause" determination because "issue [was] exceedingly simple," determined the injunction was "just and proper," and remanded the case with directions to grant injunction); but see, Nixon Detroit Diesel, 859 F.2d at 30 (district court failed to articulate reasons for finding that injunctive relief was not "just and proper"; case remanded "for the District Court to specifically enumerate its reasons for finding ... injunctive relief to be or not be just and proper"). Thus, we will analyze the Board's petition under the appropriate standards.
 
 III.
 A. Reasonable Cause
 
 21
 The Board carries a "relatively insubstantial" burden when establishing reasonable cause to believe a violation of the Act has occurred. Nixon Detroit Diesel, 859 F.2d at 29. "To satisfy that burden, the Director must produce some evidence in support of the petition and 'need not convince the court of the validity of the Board's theory of liability, as long as the theory is substantial and not frivolous.' " United Paperworkers, 965 F.2d at 1406-07 (quoting Gottfried v. Frankel, 818 F.2d 485, 493 (6th Cir.1987)). So long as the Board presents evidence that supports its theory, conflicting evidence does not preclude a finding of reasonable cause. Nixon Detroit Diesel, 859 F.2d at 29.
 
 
 22
 The Director's theory of liability hinges upon whether Specialty is a successor corporation to Western that has an obligation to recognize and bargain with the Union under NLRB v. Burns Security Services, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). That Specialty refused to recognize and bargain with the Union is undisputed. Thus, if Specialty is indeed obligated to recognize and bargain with the Union under the successorship doctrine, it has violated the Act by failing to do so.[3] In determining whether the successorship doctrine applies,
 
 
 23
 [T]he focus is on whether there is "substantial continuity" between the enterprises. Under this approach, the Board examines a number of factors: whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers.
 
 
 24
 Fall River Dyeing & Finishing Co. v. NLRB, 482 U.S. 27, 43, 107 S.Ct. 2225, 2236, 96 L.Ed.2d 22 (1987).
 
 
 25
 The Director presented evidence in the administrative hearing before the ALJ that Specialty had purchased the assets of Western, its predecessor, hired Western's employees, and continued the business essentially unchanged. Thus, under Fall River Dyeing, this evidence supports the Director's theory that Specialty is a successor corporation to Western that is obligated to recognize and bargain with the Union. It is not necessary for us to determine that Specialty is in fact Western's successor. We hold that the Director established reasonable cause to believe that Specialty engaged in unfair labor practices.[4]
 
 B. Just and Proper
 
 26
 Having concluded that "reasonable cause" exists, we next determine whether the relief sought by the Director would be "just and proper." In making this determination, our primary concern "is whether such relief is 'necessary to return the parties to [the] status quo pending the Board's proceedings in order to protect the Board's remedial powers under the NLRA, and whether achieving [the] status quo is possible.' " United Paperworkers, 965 F.2d at 1410 (quoting Gottfried, 818 F.2d at 495). We note that the status quo is the state of affairs existing before the alleged unfair labor practices took place. Id.; Nixon Detroit Diesel, 859 F.2d at 30 n. 3. The alleged unfair labor practices at issue in the petition, involve only Specialty since Specialty is the present employer. The underlying unfair labor practice charges involve claims against Specialty and Western.
 
 
 27
 At the time Western began engaging in allegedly unfair labor practices in November 1991, the Union represented Western's employees and a collective bargaining agreement was in existence. We look to this time since as a successor corporation, Specialty would be liable for its predecessor's labor transgressions. Thus, the state of affairs before the alleged unlawful conduct began was that of union representation. We must therefore ask whether an interim injunction ordering Specialty to recognize and bargain with the Union, a return to the status quo, is necessary to preserve the remedial powers of the Board.
 
 
 28
 The Board argues that the injunction it requests is necessary because Specialty's current unlawful conduct is causing the Union's member support to erode, and if this erosion continues, any forthcoming Board order to bargain will be a nullity. In Asseo v. Centro Medico del Turabo, 900 F.2d 445 (1st Cir.1990), the First Circuit affirmed a section 10(j) interim bargaining order issued against a successor corporation. It believed that the order was "the only effective way to prevent irreparable erosion of employee support for the Union." Id. at 454. The court noted:
 
 
 29
 [T]here was a very real danger that if [the employer] continued to withhold recognition from the Union, employee support would erode to such an extent that the Union could no longer represent those employees. At that point, any final remedy which the Board could impose would be ineffective.
 
 
 30
 Id. Asseo lends strong support to the proposition that issuing an interim bargaining order against Specialty would be "just and proper" in this case.
 
 
 31
 Specialty argues that the Board's delay in seeking temporary relief under section 10(j) precludes the issuance of an injunction. It alleges that because of the delay, any harm that might occur in the absence of the requested injunction, namely the erosion of employee support for the Union, has already occurred due to the Board's tardiness. The Board became aware of the alleged unfair labor practices of Western in January of 1992. It did not file the instant petition requesting relief against Specialty until February 3, 1993. At the hearing, the District Court wanted to know why it had taken the Board fourteen months to get this matter to a hearing. The Board explained that Specialty did not exist until June of 1992 and did not take over operation of the plant until September of 1992. During the summer of 1992, the Union and Specialty were engaged in settlement negotiation. When the negotiations failed, the Union filed unfair labor practice charges against Specialty on November 6, 1992. Approximately three months elapsed between the filing of these charges and the filing of the Board's instant petition. We do not believe a three-month delay is excessive and does not preclude the issuance of an injunction in this case. Furthermore, we attach little significance to the union decertification petition because the petition was circulated while the company was allegedly engaging in unfair labor practices.
 
 
 32
 We hold that there is reasonable cause to believe that Specialty is a successor corporation to Western and that Specialty engaged in unfair labor practices; we further hold that the injunctive relief sought by the Director in his section 10(j) petition is just and proper since it is necessary to prevent further erosion of union support.
 
 IV.
 
 33
 Accordingly, the judgment of the District Court is REVERSED and the case is REMANDED with instructions to the District Court to issue the relief requested in the Director's petition.
 
 
 
 *
 This decision was originally issued as an "unpublished decision" filed on October 14, 1993. On November 23, 1993, the court designated the opinion as one recommended for full-text publication
 
 
 [1]
 The Administrative Law Judge ("ALJ") of the NLRB rendered his decision on June 22, 1993. The ALJ found in favor of the Board as to the charges against both Western and Specialty. The record does not indicate whether the Board has adopted the ALJ's decision. If the Board indeed adopts the ALJ's decision, it must still file a petition for enforcement with this Court, pursuant to 29 U.S.C. Sec. 160(e), before the ALJ's orders are enforced. Thus, the ALJ's decision on the merits of the charges does not render the present appeal moot
 
 
 [2]
 Section 10(j) of the Act provides in pertinent part:
 The Board shall have power, upon issuance of a complaint ... charging that any person has engaged in or is engaging in an unfair labor practice, to petition [a] United States district court ... for temporary relief or [a] restraining order. Upon filing of any such petition the court shall ... have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.
 29 U.S.C.A. Sec. 160(j) (West 1973).
 
 
 [3]
 Section 8(a)(5) of the Act, 29 U.S.C. Sec. 158(a)(5), makes it an unfair labor practice for an employer to refuse to bargain with the collective-bargaining representative of its employees
 
 
 [4]
 Before the District Court, Specialty took the position that it had no obligation to recognize and bargain with the Union for two reasons. First, it argued that it was not a successor corporation to Western because of the intervening receivership. Second, it argued that even if it were a successor to Western, it still had no obligation to recognize and bargain with the Union because the Union had lost majority support in March 1992, as evidenced by a petition for decertification. These positions, however, do not detract from the substantial and non-frivolous nature of the Director's theory of successorship liability, as well as the evidence the Director put forth to support the theory