55 F.3d 208
 149 L.R.R.M. (BNA) 2385, 63 USLW 2788,
130 Lab.Cas. P 11,338
 Frederick J. CALATRELLO, Regional Director for Region 8 of
the National Labor Relations Board, for and on
Behalf of the National Labor Relations
Board, Petitioner-Appellant,
v.
"AUTOMATIC" SPRINKLER CORPORATION OF AMERICA and Figgie
International, Inc., Respondents-Appellees.
 No. 94-4213.
 United States Court of Appeals,
Sixth Circuit.
 Argued April 4, 1995.
Decided May 22, 1995.
 
 1
 Eric C. Marx (argued), Ellen A. Farrell (briefed), Deputy Associate Gen. Counsel, Corinna L. Metcalf, N.L.R.B., Washington, DC, for petitioner-appellant.
 
 
 2
 Phillip J. Campanella (argued & briefed), Calfee, Halter & Griswold, Cleveland, OH, for respondents-appellees.
 
 
 3
 Helene D. Lerner (briefed), William W. Osborne, Jr. (argued), Beins, Axelrod, Osborne, Mooney & Green, Washington, DC, for amicus curiae Road Sprinkler Fitters Local Union No. 669, U.A., AFL-CIO.
 
 
 4
 Before: MERRITT, Chief Judge; SILER, Circuit Judge; EDMUNDS, District Judge.*
 
 
 5
 EDMUNDS, District Judge.
 
 
 6
 Frederick J. Calatrello, the Regional Director ("Director") for Region 8 of the National Labor Relations Board ("NLRB" or "Board"), appeals on behalf of the Board from an order of the United States District Court for the Northern District of Ohio denying temporary injunctive relief sought under section 10(j) of the National Labor Relations Act ("NLRA" or "the Act"), 29 U.S.C. Sec. 160(j), pending final outcome of Board proceedings on unfair labor practice charges. Because the Board failed to show that injunctive relief would be just and proper, we affirm the judgment of the district court.I
 
 
 7
 "Automatic" Sprinkler Corp. of America ("Automatic" or "the Company"), Defendant in the underlying unfair labor practice proceeding and appellee in the present appeal, is engaged in the sale, design, fabrication, inspection, installation, maintenance, project management, repair, and service of fire sprinkler systems. Automatic is a division of Figgie International, Inc., also a Defendant in the underlying unfair labor practice proceeding and appellee in the present appeal. As late as 1992, Automatic conducted its domestic business through at least 38 offices in the United States. The Company's economic fortunes have declined recently. Its gross sales fell from $140 million in 1990 to $106 million in 1992 and to $104 million in 1993. Its pretax profit fell from $7 million in 1990 to $905,000 in 1991. As a result of cost reductions, the Company's pretax profit rose in 1992 to $5.4 million, but the Company lost $1.9 million in 1993 and lost $13.9 million in the first five months of 1994.
 
 
 8
 For many years, the Company's sprinkler fitter employees working in industrial, commercial, and residential buildings have been represented by Local Unions affiliated with the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada ("the Local Unions"). The largest bargaining unit, comprising 263 of the Company's 359 employees, is represented by Local Union 669 and encompasses 48 states and the District of Columbia. The jurisdictional area of each of the smaller local unions corresponds to a particular state or major metropolitan area.[1] Until February 1993, the Company was a member of, and represented by, the National Fire Sprinkler Association ("NFSA"), a national multi-employer bargaining association which represents hundreds of member contractors in collective bargaining with the Local Unions. During this period, the Company was bound to the NFSA's collective-bargaining agreements with the Unions, with expiration dates from July 31, 1993 to June 30, 1995.
 
 
 9
 Until his resignation May 18, 1994, Harry E. Figgie, Jr., was Chairman of the Board and Chief Executive Officer of Figgie International, the corporate parent of the Company. According to the affidavits of Company managers, Mr. Figgie closely monitored, supervised, and controlled the Company's labor relations. Moreover, according to the affidavit of a former Company President, Mr. Figgie repeatedly expressed a desire that the Company employ non-union labor for its sprinkler installation, maintenance, and service operations.
 
 
 10
 In the fall of 1992, after analyzing sales and profitability trends, the Company decided that it would be more cost effective for it to lay off all its sprinkler installation, maintenance, and service employees ("sprinkler fitter employees"), and to subcontract the performance of those operations.[2] This plan was contained in an internal Company document originally distributed to key personnel titled "PRO FORMA III-A, NEUTRAL OPERATIONS." Under the plan, the Company would withdraw from the NFSA, terminate its collective bargaining agreements with various Local Unions upon their expiration, and liquidate its vehicles, tools, and equipment. The Company would continue to hold itself out as the general contractor for the sprinkler installation, maintenance, and service operations and bid on those operations, and then subcontract the labor requirements to small union or non-union subcontractors, whichever bid lowest. The stated goal of the plan was "modifying 'Automatic' Sprinkler's approach to providing for the labor content of its contracting business thereby positioning 'Automatic' as a leading fire protection general contractor servicing both union and non-union markets within the fire protection industry at the expiration of the current union contract agreements." The plan more specifically stated the Company's purposes, including: "to gain control of labor costs on projects and to minimize ... the risk potential for labor cost overruns on contracts"; to avoid being a "signatory to any union contract, pay its demands and work rules"; to "eliminate labor negotiations"; to "eliminate costs associated with union grievances"; to reduce "administration costs associated with union labor"; to allow the Company "to bid on both union and non-union projects"; and to allow the Company to "become competitive against non-union contractors."
 
 
 11
 The Company withdrew from the NFSA February 5, 1993, timely notifying most or all of the Unions of this action. In April and May 1993, the Company began subcontracting sprinkler installation, maintenance, and service work, and has since bid its prospective contracts as a general contractor with the intention of subcontracting the labor requirements.
 
 
 12
 The Company contends that between August 17, 1993 and June 29, 1994, it invited the Local Unions to meet for the purpose of negotiating and discussing the Company's plan to subcontract its work. By letter dated November 29, 1993, and January 28, 1994, the Company notified many of the Local Unions of its intent not to renew the collective bargaining agreement after the termination of the current agreement, to no longer employ persons represented by the union in its sprinkler installation operations, and to implement this "fundamental change in its business effective April 1, 1994." The Company further wrote that "[i]n the event that you desire to discuss this business decision and the effects thereof on members of your Union who are or were employed by [the Company], please give me a call. You may be assured the Company will negotiate in good faith with you concerning this business decision and its effects on those employees affected by the decision."
 
 
 13
 Subsequently, the Company and Local Unions exchanged numerous letters proposing dates to meet and discuss the Company's subcontracting decision. The Company met with ten of the twelve Local Unions between February 7 and May 2, 1994.[3] At all these meetings, the Company's attorney explained the subcontracting decision to the Union representatives, and notified the Unions that the Company had no intention of entering into a new collective bargaining agreement, that most subcontractors had hired and were hiring Union employees, and that the Company would not assure the Unions that it would subcontract work only to subcontractors with union employees.
 
 
 14
 Although the Company notified all Local Unions of its intention to subcontract its sprinkler installation operations by January 28, 1994 and met with many Local Unions from August 17, 1993 to May 12, 1994, the Company had subcontracted all of its sprinkler installation operations and laid off all its sprinkler fitter employees by April 1, 1994. During the period from May 1993 through June 30, 1994, the Company liquidated substantially all of the construction vehicles, tools, and equipment formerly used to perform labor work on its sprinkler installation operations. Since then, the Company has subcontracted 96.89 percent of its labor work to entities which have signed current collective bargaining agreements with the Local Unions.
 
 II
 
 15
 The Unions filed various unfair labor practice charges with the NLRB between August 18, 1993 and May 26, 1994 regarding the Company's subcontracting decision. The Board issued a complaint June 28, 1994, alleging that the Company violated sections 8(a)(1), (3) and (5) of the Act, 29 U.S.C. Sec. 158(a)(1), (3), and (5). The Board then filed a petition for injunctive relief July 1, 1994 in the district court, alleging there was reasonable cause to believe that the Company unlawfully subcontracted its sprinkler installation, maintenance, and service work for discriminatory reasons and without bargaining with, or obtaining the consent of, the Local Unions representing the employees performing this work. The petition further alleged that unless the district court placed the Company under legal restraint, it was likely that a final order issued by the Board would be ineffective to vindicate the employees' rights under the Act. The petition sought an order, pending resolution by the Board, requiring the Company to restore its sprinkler fitting operations as they existed prior to the Company's subcontracting of all unit work, to reinstate the employees who had been performing this work, and to recognize and, upon request, bargain in good faith with the Unions.
 
 
 16
 At the request of the NLRB, and over the objection of the Company, the district court determined the merits of the petition based upon the affidavits and exhibits submitted by the parties and without oral testimony or oral argument. The district court denied the petition for injunctive relief September 16, 1994. The district court issued findings of fact and conclusions of law September 28, 1994, finding that the Board had failed to prove there is reasonable cause to believe that the Company committed an unfair labor practice and that the evidence did not establish that the injunctive relief requested by petitioner is just and proper.
 
 III
 
 17
 Unfair labor practice charges are most often resolved through the administrative procedures provided in the National Labor Relations Act and, when necessary, enforced by the courts of appeals. Kobell v. United Paperworkers Intern., 965 F.2d 1401, 1406 (6th Cir.1992). But because administrative review can be slow, Congress provided the Board in Sec. 10(j) of the Act with the ability to petition a district court to enjoin alleged unfair labor practices pending Board review of the substantive evidence of those practices. Id.[4] To award injunctive relief under Sec. 10(j), the district court must make two findings. First, the court must find there is "reasonable cause" to believe that the alleged unfair labor practice has occurred. Second, if such reasonable cause is found to exist, the court must then determine whether injunctive relief is "just and proper." Frye v. Specialty Envelope, Inc., 10 F.3d 1221, 1224-25 (6th Cir.1993). If the district court answers either of these questions in the negative, the district court must deny the petition. Fleischut v. Nixon Detroit Diesel, Inc., 859 F.2d 26, 29 (6th Cir.1988). The district court's analysis and this Court's review of each of these steps is a separate inquiry with differing standards. Id.
 
 A. Reasonable cause
 
 18
 To establish "reasonable cause," the Director bears a "relatively insubstantial" burden. Gottfried v. Frankel, 818 F.2d 485, 493 (6th Cir.1987). The Director only need produce some evidence in support of the petition and "need not convince the court of the validity of the Board's theory of liability, as long as the theory is substantial and not frivolous." Id. "It follows from this that the district court need not concern itself with resolving conflicting evidence if facts exist which could support the Board's theory of liability." Nixon Detroit Diesel, 859 F.2d at 29. "[S]ection 10(j) proceedings are merely ancillary to unfair labor practice proceedings to be conducted before the Board. The district courts are not to adjudicate the merits of the unfair labor practice case. The question of whether a violation of the Act has been committed is a function reserved exclusively to the Board, subject to appellate court review of final Board orders." Id. at 28-29 (emphasis in original).
 
 
 19
 Review of the district court's finding on the reasonable cause portion of the Sec. 10(j) petition involves mixed questions of law and fact. Nixon Detroit Diesel, 859 F.2d at 29. The reasonable cause analysis is divided into two parts. The first is whether the Regional Director's legal theory is substantial. This is a question of law. The second is whether the facts as found satisfy that theory. Id. Therefore, if we believe the district court erred in its determination of the substantiality of the Regional Director's legal theory, we may reverse the reasonable cause finding of the district court. United Paperworkers Intern., 965 F.2d at 1407. But in reviewing whether the district court erred in finding the facts and whether those facts satisfy the Regional Director's theory, we may only reverse if such fact finding was clearly erroneous. Id.
 
 
 20
 We find that the district court erred by not finding that the Board carried its "relatively insubstantial" burden in establishing that reasonable cause exists to believe that the Company's subcontracting plan violated Sec. 8(a)(3) of the Act and that the Company violated Sec. 8(a)(5) of the Act by failing to bargain in good faith with the Local Unions prior to subcontracting all unit work and laying off all bargaining unit employees. First, the Company's internal document containing the plan titled "PRO FORMA III-A," in which the Company stated the purposes of the subcontracting plan, including to "avoid being a signatory to any union contract, pay its demands and work rules," to "eliminate labor negotiations," to "eliminate costs associated with union grievances," and to reduce "administration costs associated with union labor," is direct evidence that the Company's subcontracting decision was discriminatorily motivated, and sufficient to show reasonable cause of a Sec. 8(a)(3) violation at least in this proceeding. Further, a former Company President testified that Mr. Figgie, who controlled the Company's labor negotiations and was Chairman and CEO of the Company's parent company, repeatedly expressed a desire to convert the Company into a non-union company.
 
 
 21
 That the Company's desire to rid itself of unionized employees arises from claimed economic necessity is irrelevant. "[A]nti-union animus is no less anti-union animus simply because it springs from serious economic considerations. Indeed, ... in the majority of cases where employers commit unfair labor practices ..., the employers break the law primarily out of concern for their economic welfare." NLRB v. C.J.R. Transfer, Inc., 936 F.2d 279, 283 (6th Cir.1991).
 
 
 22
 Second, the Board produced sufficient evidence that the Company's subcontracting decision was a mandatory subject of bargaining because (i) the Company in effect substituted the subcontractors' employees for its own, (ii) the Company continues to install and maintain sprinklers, and (iii) the Local Unions had substantial control or authority over the basis for the Company's subcontracting decision, that is, labor costs. Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 214, 85 S.Ct. 398, 404-05, 13 L.Ed.2d 233 (1964). Further, the Board produced sufficient evidence that the Company did not bargain in good faith over this mandatory subject of bargaining because it presented the Local Unions with a fait accompli. Ciba-Geigy Pharmaceuticals Div., 264 NLRB 1013, 1017, 1982 WL 23768 (1982), enf'd, 722 F.2d 1120 (3d Cir.1983). The Company fully implemented its subcontracting plan by April 1, 1994. The Company did not notify some of the Local Unions of this change until after the Company completed the change, and the Company met with only half of the twelve Local Unions prior to April 1, 1994. At those meetings, there is evidence that the Company's attorney merely explained the subcontracting decision to the Union representatives, notified the Unions that the Company had no intention of entering into a new collective bargaining agreement, and refused to assure the Unions that it would subcontract only with subcontractors with union employees. Therefore, the Board produced evidence to support its theory that the Board did not provide the Local Unions notice of the subcontracting change sufficiently in advance of the actual implementation of the change to allow a reasonable opportunity to bargain in violation of Sec. 8(a)(5). Thus the district court erred in finding that there was not reasonable cause to believe that unfair labor practices had occurred.
 
 B. Just and proper
 
 23
 Nevertheless, we affirm the district court because it did not abuse its discretion by finding that an injunction would not be just and proper. The primary concern under the just and proper inquiry "is whether such relief 'is necessary to return the parties to [the] status quo pending the Board's proceedings in order to protect the Board's remedial powers under the NLRA, and whether achieving [the] status quo is possible.' " Specialty Envelope, 10 F.3d at 1226 (quoting Frankel, 818 F.2d at 495). The status quo is the state of affairs existing before the alleged unfair labor practices took place. Id. The primary purpose of Sec. 10(j) is "to give the Board a means of preserving the status quo pending completion of its regular procedures," which might be ineffective if immediate relief cannot be granted. Nixon Detroit Diesel, 859 F.2d at 30 (quoting Levine v. C & W Mining, Co., Inc., 610 F.2d 432, 436 (6th Cir.1979)).
 
 
 24
 The inquiry whether injunctive relief is "just and proper" is committed to the discretion of the trial judge. Frankel, 818 F.2d at 494. Therefore, we must determine whether the district court's refusal to issue an injunction under Sec. 10(j) constitutes an abuse of discretion. United Paperworkers Intern., 965 F.2d at 1409-10. The district court abuses its discretion when it relies upon clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard. Id.
 
 
 25
 The district court found that the requested injunctive relief was not just and proper because if return to the status quo ante can be achieved at all, it can be achieved after the Board's determination with the same degree of burden as it can be presently achieved, that achieving the status quo ante would impose a substantial financial burden on the Company which may cause its demise and for which it would have no remedy, that the Company will not achieve an unlawful objective as a result of any delay in the adjudication by the Board, that subcontracting here causes no adverse impact to the Local Unions because their members have been performing substantially all of the Company's labor work, and that the Company's alleged unfair labor practices will not cause irreparable harm to the Unions because the Company has subcontracted 96.89 percent of its labor work to entities that have signed current collective bargaining agreements with the Local Unions.
 
 
 26
 While the district court may have mischaracterized an aspect of its inquiry in discussing these facts under the rubric of irreparable harm to the Local Unions and employees, Specialty Envelope, 10 F.3d at 1224,[5] we find that the district court did not abuse its discretion in finding that injunctive relief would not be just and proper because the injunction sought by the Board is too broad, would result in undue financial hardship to the Company, and is not necessary to preserve the ultimate remedial authority of the Board.
 
 
 27
 In C & W Mining, 610 F.2d at 437-38, this Court considered a district court decision which enjoined a company from engaging in a number of alleged unfair labor practices, including the proposed sale of trucks, except as part of an agreement with the union. The sale of trucks would have resulted in the loss of employment for its drivers. We affirmed the injunction, except for the order prohibiting the sale of trucks without collective bargaining. We held that this matter was better left for Board determination because the company produced testimony that it intended to return to its previous practice of contracting with outside truckers to haul its coal and that the company had sustained serious financial losses in the sale of its own trucks. Id. at 438.
 
 
 28
 We believe that this matter presents an even stronger case than C & W Mining for leaving this matter for ultimate Board determination. As in C & W Mining, the Company here produced evidence that it sustained serious financial losses by using its own employees in its sprinkler fitting labor operations, and that it wanted to therefore subcontract such labor work. But unlike C & W Mining, where the injunction sought to prohibit the Company from in the future selling its trucks and subcontracting with outside truckers, the Company here has already subcontracted all its labor work and sold all of its tools, equipment, and materials required to perform the labor work that the Company now subcontracts.
 
 
 29
 Therefore, the district court found that return to the status quo ante would require the Company to buy back its tools, equipment, and material required to perform labor work at a cost of $1.2 million, to lease vehicles for labor work at a cost of $171,000 per month, to hire employees to perform the administrative duties associated with labor work at a cost of $4,600 per month, to maintain, repair, and transport its tools at a cost of $300,000 annually, and to rejoin the multi-employer bargaining organization at a cost of at least $70,000. The district court further found that return to the status quo ante would result in the loss to the Company of projected annual labor overrun savings of $4 million, of annual worker compensation premium savings of $400,000, and unspecified losses by interference with existing contracts with subcontractors. Taking the district court's findings as a whole, return to the status quo ante would cost the Company more than six million dollars. While the district court apparently did not consider that the Company would save money by not having to pay subcontractors to perform its labor work, we are satisfied for the purposes of this proceeding that return to the status quo ante would be extremely financially burdensome for the Company.
 
 
 30
 The Board argues that the district court abused its discretion because it failed to recognize that interim relief is necessary to prevent the employees who have been discriminatorily denied employment in this case from "scattering to the four winds" before a Board order issues. See Specialty Envelope, 10 F.3d at 1226-27. We disagree. The Company has subcontracted 96.89 percent of its labor work to entities which have signed current collective bargaining agreements with the Local Unions. Thus most former employees in the bargaining unit still perform labor work on Company sprinkler fitting operations, albeit through a subcontractor, and are thus available should the Board issue a bargaining or reinstatement order at some later proceeding. Accordingly, injunctive relief is not necessary to prevent employees from "scattering to the four winds" immediately. Furthermore, the collective bargaining agreements themselves allowed the Company to subcontract labor work to companies which have signed a current collective bargaining agreement with the Local Unions. An injunction requiring a return to the "status quo ante," therefore, would still have to allow the company to subcontract labor work to companies which employ union labor. In this context, the Board's request that the injunction prohibit the Company from contracting with unionized subcontractors makes little sense. It is possible the Company's actions would weaken the Local Unions if the Company subcontracts to more non-union entities, but this harm is too speculative to conclude that Board relief following unfair labor practice proceedings would be ineffective without injunctive relief. We therefore find that the district court did not abuse its discretion by finding that injunctive relief would not be just and proper.
 
 IV
 
 31
 Accordingly, we AFFIRM the judgment of the district court without prejudice to the Board to seek a narrower injunction.
 
 
 
 *
 The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The approximate number of full-time members of the Local Unions and those employed by the Company were as follows: Local 120--Cleveland (13 unit employees); Local 281--Chicago (14 unit employees); Local 314--Kansas City (3 unit employees); Local 483--San Francisco (6 unit employees); Local 536--Baltimore (11 unit employees); Local 542--Pittsburgh (6 unit employees); Local 676--Connecticut (2 employees); Local 692--Philadelphia (20 unit employees); Local 696--New Jersey (13 unit employees); Local 699--Seattle (4 unit employees); and Local 709--Los Angeles (5 unit employees)
 
 
 [2]
 Significantly, virtually all of the collective bargaining agreements at issue here contained a clause which allowed the company to contract with unionized subcontractors: see, e.g., J.A. at 166, "any employer party to this agreement may subcontract work as outlined in [this agreement] provided he subcontract to a contractor that has a collective bargaining agreement with the [local union]."
 
 
 [3]
 There is no evidence of any meeting with Local Unions 692 or 696
 
 
 [4]
 Section 10(j) provides as follows:
 The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged or is engaging in an unfair labor practice, to petition any United States district court, within the district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.
 29 U.S.C. Sec. 160(j).
 
 
 [5]
 In contrast with the First, Second, Seventh, and Ninth Circuits, we do not consider the degree of irreparable harm to the unions and employees in Sec. 10(j) determinations in this Circuit. Compare Specialty Envelope, 10 F.3d at 1224; United Paperworkers Intern., 965 F.2d at 1409 n. 3; Nixon Detroit Diesel, 859 F.2d at 30 n. 3 with Miller v. California Pacific Medical Center, 19 F.3d 449, 456-60 (9th Cir.1994); Kinney v. Pioneer Press, 881 F.2d 485, 490-91 (7th Cir.1989); Maram ex rel. NLRB v. Universidad Interamericana de Puerto Rico, Inc., 722 F.2d 953, 958 (1st Cir.1983); Kaynard ex rel. NLRB v. Mego Corp., 633 F.2d 1026, 1033 (2d Cir.1980)