**William C. SCHAUB, Jr., for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**DETROIT NEWSPAPER AGENCY, d/b/a Detroit Newspapers; The Detroit News, Inc.; and Detroit Free Press, Inc., Respondents.**

No. 97–CV–73260.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 14, 1997.

Amy E. Bachelder, Linda Rabin, Mark D. Rubin, Blair K. Simmons, Detroit, MI, Ellen A. Farrell, Washington, DC, for Petitioner.

Robert M. Vercruysse, Ann M. Kelly, Bingham Farms, MI, Andrew Kramer, James Rydzel, Cleveland, OH, for Respondents.

Samuel C. McKnight, Fairfax, VA, John R. Canzano, Southfield, MI, Leonard D. Givens, Detroit, MI, for AMICI.

### *OPINION AND ORDER DENYING INJUNCTIVE RELIEF*

O'MEARA, District Judge.

Before the court is the National Labor Relations Board's ("the Board") July 7, 1997 Petition for an injunction pursuant to section 10(j) of the National Labor Relations Act, as amended, (hereinafter NLRA or "the Act").[1] Petitioner seeks the reinstatement of certain employees of the Detroit Newspaper Agency (DNA) who worked at the *Detroit News* and the *Detroit Free Press,* and editorial employees of the *News* and *Free Press,* all of whom went on strike July 13, 1995.

Respondents submitted their opposition to the Petition on July 26, 1997. The court has, by stipulation, allowed limited intervention as amicus curiae of the charging party unions,[2] which have filed a brief, and the replacement employees now working at the newspapers, on whose behalf another brief has been filed. The court heard oral argument on August 1, 1997. Based upon the law as applied to the facts of this case and consistent with the analysis which follows, the court DENIES

---

1. The court has jurisdiction over the parties and the subject matter of this case. *See* 28 U.S.C. §§ 1331, 1345; 29 U.S.C. § 160(j).

2. The unions are Detroit Mailers Union No.2020, International Brotherhood of Teamsters; Detroit Typographical Union No. 18, Communications Workers of America; GCIU Local Union No. 13N and Local Union No. 289, Graphic Communications International Union; Newspaper Guild of Detroit Local 22; and Teamsters Local No. 372. (The charging unions are hereinafter referred to as "the unions.")

the relief sought by the Board and DISMISSES its Petition.

## I. BACKGROUND

The *Detroit News* and *Detroit Free Press* have combined non-editorial operations pursuant to a Joint Operating Agreement. (Respondents *Detroit News, Detroit Free Press,* and DNA will hereinafter be collectively referred to as "the newspapers" when a more specific reference to one or more of the respondents is not required). The DNA manages the newspapers' merged advertising, circulation, marketing, and production operations. The DNA is the employer of all *Free Press* and *News* workers except for the editorial employees, who are employed separately by the individual newspapers. The newspapers engage in collective bargaining with ten exclusive bargaining agents and last reached an agreement with all the unions in 1992. That agreement expired on April 30, 1995. Before the contract expiration, the newspapers reached agreements covering four of the ten bargaining units.

The six remaining bargaining units and the newspapers were unable to agree on a new contract; and their members struck July 13, 1995. More than three hundred (300) issues remained open; and despite continued bargaining during the strike, more than ninety percent (90%) of those issues are still unresolved. Kelleher Decl. at ¶ 28, Ex. L. For the first few weeks of the strike, the newspapers operated with a combination of supervisors, loaned employees, independent contractors, and temporary workers. When it became clear, in early August 1995, that the strike would not be resolved quickly, Respondents notified union members that if they did not return to work, permanent replacements would be hired. The newspapers began employing replacement workers and today operate with a workforce which includes such workers.

In June, July, and August 1995, the unions filed a series of unfair labor practice charges, alleging that Respondents had engaged in bad faith bargaining in violation of sections 8(a)(1) and 8(a)(5) of the NLRA. In response to the unfair labor practice charges, petitioner Board issued a number of Complaints against Respondents beginning August 23, 1995. The Complaints were consolidated as Petitioner's Fourth Consolidated Amended Complaint (Complaint I) and went to trial before Administrative Law Judge Thomas R. Wilks (ALJ). The trial hearings were held on various dates from April through October 1996. Complaint I requested, *inter alia,* relief in the form of an order directing Respondents to reinstate striking employees to their former positions at the newspapers upon receipt of appropriate unconditional offers to return to work. Resp'ts Ex. K, Vol. V (showing that such relief was requested as early as the Second Consolidated Amended Complaint filed January 23, 1996).

The ALJ's Decision and Recommended Order was not filed until June 19, 1997. That decision of the ALJ found that certain of the newspapers' unfair labor practices [3] helped to cause and prolong the strike.[4] The ALJ noted that "the record evidence discloses a multitude of economic causal factors for the strike, and there is no basis upon which to conclude definitively that a strike would not have occurred absent the unfair labor practices." Pet.'s Ex. 3 at 107. The ALJ also found that "there is no allegation

---

**3.** These included charges that the *News* had implemented a merit pay plan and had otherwise violated section 8(a)(5) of the Act and that the DNA had done so by allegedly reneging on an agreement to engage in joint bargaining with the unions. Pet.'s Ex. 3 at 2–3.

**4.** Although the *Free Press* was not charged with the unfair labor practices which the ALJ found helped cause the strike, the ALJ found that the *Free Press*—along with the *News* and the DNA—helped prolong the strike by unlawfully threatening to hire permanent replacements for strikers engaged in an unfair labor practice strike. Pet.'s Ex. 3 at 97. The ALJ found that the *Free Press*

workers were striking in sympathy with their fellow union members at the *News,* whose strike was caused, at least in part, by unfair labor practices. The AU finding that the *Free Press* strikers were sympathy strikers, if it holds up on review, would extend to *Free Press* workers the status of "unfair labor practice strikers." Without this finding, the *Free Press* workers would have been economic strikers; and the *Free Press* proposal (or threat) to hire permanent replacements would not have been illegal, that is, would not have been an unfair labor practice even if it did help prolong the strike.

that the Respondents engaged in a general course of bad-faith bargaining. In fact, bargaining resumed and continued after the strike." *Id.* The ALJ's recommended order required Respondents to reinstate striking employees upon an unconditional offer to return, displacing, if necessary, replacement workers hired since July 13, 1995. Pet.'s Ex. 3 at 113.

Respondents have filed Exceptions to the ALJ's Decision and Recommended Order with the National Labor Relations Board. Those Exceptions have not yet been scheduled to be considered by the Board. In their Exceptions, the newspapers maintain their contention that they did not commit the unfair labor practices the ALJ concluded they had committed and that, in any event, no illegal activity on the part of the newspapers was causally related to the strike or prolonged it.

In February 1997, while the ALJ was considering the evidence before him on the allegations of Complaint I, the unions made unconditional offers to return to work on behalf of their members. Respondents, contending that the July 13, 1995 strike was not caused or prolonged by newspaper unfair labor practices, have offered striking employees work only as vacancies occur,[5] consistent with the requirements of the law in the aftermath of an *economic* strike. *See NLRB v. Mackay Radio & Telegraph Co.,* 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938).

On February 21, 1997, the unions requested that the Board start the internal process which would enable the Board to seek section 10(j) injunctive relief based on the consolidated cases pending before the ALJ. Resp'ts Ex. F, Vol. V. Responding to the newspapers' insistence that the strike was an economic strike and that the newspapers were not required to reinstate former strikers except as vacancies occurred, the unions filed a new unfair labor practice charge alleging that the newspapers' position violated sections 8(a)(1) and 8(a)(3) of the Act. (NLRB Case No. 7–CA–39522.) This charge was filed on February 24, 1997. On May 23, 1997, the NLRB

General Counsel recommended to the Board that it authorize the regional director to seek injunctive relief under section 10(j) of the Act. On July 1, 1997, the Board so authorized.

The next day, July 2, 1997, Petitioner issued its Amended Complaint ("Complaint II") against the newspapers based solely upon the union's February 24, 1997 charge. That Complaint is scheduled to proceed to trial before an administrative law judge on September 8, 1997; and it is upon Complaint II alone that the Board bases its Petition here.

## II. LAW: STANDARDS FOR RELIEF

The merits of unfair labor practice charges are to be determined by the National Labor Relations Board, subject to review by the appropriate appellate court. "But because administrative review can be slow, Congress provided the Board in § 10(j) of the Act [NLRA] with the ability to petition a district court to enjoin alleged unfair labor practices pending Board review of the substantive evidence of those practices." *Calatrello v. "Automatic" Sprinkler Corp. of America,* 55 F.3d 208, 212 (6th Cir.1995). Section 10(j) bestows upon district courts "jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper." 29 U.S.C. § 160(j).

■ The circuits are split on the issue of the appropriate legal standard governing section 10(j) injunctions. In the Sixth Circuit, the district court must make two findings:

First, the court must find there is "reasonable cause" to believe that the alleged unfair labor practice has occurred. Second, if such reasonable cause is found to exist, the court must then determine whether injunctive relief is "just and proper."

*"Automatic" Sprinkler,* 55 F.3d at 212. Accord *Arlook v. S. Lichtenberg Co.,* 952 F.2d 367 (11th Cir.1992); *Pascarell v. Vibra Screw, Inc.,* 904 F.2d 874 (3rd Cir.1990); *Minnesota Mining & Manuf. Co. v. Meter,* 385 F.2d 265 (8th Cir.1967); *Angle v. Sacks,*

---

**5.** As of July 22, 1997, the newspapers have reinstated more than 250 striking workers and 1125 were on the preferential hiring list. Resp't Ex.

2, Vol. I. More than 85% of the individuals on the preferential hiring list remain in the Detroit metropolitan area. *Id.* at ¶ 17.

382 F.2d 655 (10th Cir.1967). *Cf. Miller v. California Pacific Medical Ctr.*, 19 F.3d 449, 457 (9th Cir.1994) (abandoning the "reasonable cause" requirement); *Kinney v. Pioneer Press*, 881 F.2d 485, 493 (7th Cir.1989) (same).

With regard to demonstrating both "reasonable cause" and "just and proper" circumstances for injunctive relief, the petitioner Board has the burden of proof. *See, e.g., "Automatic" Sprinkler*, 55 F.3d at 212–215.

To establish "reasonable cause," the petitioning regional director has a "relatively insubstantial" burden. *Gottfried v. Frankel*, 818 F.2d 485, 493 (6th Cir.1987). To satisfy that burden, the director "need not prove that an unfair labor practice had occurred, but must only produce some evidence in support of the petition." *Id.* In addition, the director "need not convince the court of the validity of the Board's theory of liability, as long as the theory is substantial and not frivolous." *Id.* As long as the Board marshals some evidence that supports a non-frivolous legal theory, conflicting evidence does not preclude a finding of reasonable cause. *Frye v. Specialty Envelope, Inc.*, 10 F.3d 1221, 1225 (6th Cir.1993); *Fleischut v. Nixon Detroit Diesel, Inc.*, 859 F.2d 26, 29 (6th Cir.1988).

Once the court determines that reasonable cause exists, the court must then decide whether injunctive relief is "just and proper." "The just and proper determination is committed to the discretion of the district court." *Kobell v. United Paperworkers Int'l Union*, 965 F.2d 1401, 1409 (6th Cir.1992). In making this determination, "the principal consideration is whether, under the circumstances of the case, judicial action is in the public interest." *Sheeran v. American Commercial Lines, Inc.*, 683 F.2d 970, 979 (6th Cir.1982). The *Sheeran* court further explained,

> Interim judicial relief is warranted whenever "the circumstances of a case create a reasonable apprehension that the efficacy of the Board's final order may be nullified, or the administrative procedures will be rendered meaningless." In such cases

"[p]reservation and restoration of the status quo are then appropriate considerations in granting temporary relief pending determination of the issues by the Board."

*Id.* (citations omitted). Another panel of the Sixth Circuit articulated that the "appropriate focus" of the inquiry "is on whether [injunctive relief] is necessary to return the parties to status quo pending the Board's proceedings in order to protect the Board's remedial powers under the NLRA, and whether achieving status quo is possible." *Frankel*, 818 F.2d at 495. The "status quo" is defined as the situation "existing prior to the adoption of the allegedly unfair labor practice." *United Paperworkers*, 965 F.2d at 1410.

The First, Second, Seventh, and Ninth Circuits take a different approach to the "just and proper" inquiry. These courts read "just and proper" to mean that the traditional rules concerning injunctions apply. *See Miller v. California Pacific Med. Ctr.*, 19 F.3d 449, 459 (9th Cir.1994); *Kinney v. Pioneer Press*, 881 F.2d 485, 490–91 (7th Cir. 1989); *Maram v. Universidad Interamericana de Puerto Rico, Inc.*, 722 F.2d 953, 958 (1st Cir.1983); *Silverman v. 40–41 Realty Assocs.. Inc.*, 668 F.2d 678, 680 (2nd Cir. 1982). As the Seventh Circuit explained: "Section 10(j) doesn't tell us what it means to say that relief is 'just and proper,' but we have no doubt that this phrase calls upon the district court to evaluate the propriety of the Director's request with an eye toward the traditional equitable principles that normally guide such an inquiry." *Pioneer Press*, 881 F.2d at 490.

The court based its decision on direction provided by the Supreme Court in *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 313, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982). In *Romero*, the court of appeals had granted an injunction pursuant to the Federal Water Pollution Control Act without considering traditional equitable criteria. The Supreme Court reversed, noting that an injunction is an equitable remedy that does not issue as of course. *Id.* at 311, 102 S.Ct. at 1802. Further, the Court explained that the consideration of traditional equitable principles "re-

flect a 'practice with a background of several hundred years of history,' a practice of which Congress is assuredly well aware. Of course, Congress may intervene and guide or control the exercise of the courts' discretion, but we do not lightly assume that Congress has intended to depart from established principles." *Id.* at 313, 102 S.Ct. at 1803 (citations omitted).

██ Extrapolating from *Romero*, the Seventh Circuit determined that traditional equitable principles should also be considered in section 10(j) cases. A party seeking a preliminary injunction normally must demonstrate

> (i) no adequate remedy at law, (ii) irreparable harm in the absence of an injunction exceeding the irreparable harm the other side will suffer if the injunction issues, (iii) a reasonable likelihood of winning on the merits, and (iv) harm to the public interest stemming from the injunction that is tolerable in light of the benefits achieved by the relief.

*Id.* at 490 n. 3. In the 10(j) context, the "district judge must assess not only the harm that may go unchecked during the 'notoriously glacial' course of NLRB proceedings, but also the probability that the General Counsel will succeed in convincing the NLRB that someone has in fact violated the labor laws." *Id.* at 491.

The Ninth Circuit, while recognizing that district courts should consider traditional equitable criteria, has taken yet another approach. The court directed that district courts should consider traditional equitable principles "through the prism of the underlying purpose of § 10(j), which is to protect the integrity of the collective bargaining process and to preserve the Board's remedial power while it processes the charge." *Miller,* 19 F.3d at 459–60. The Ninth Circuit's approach thus combines the "frustration of re-medial purposes of the Act" standard employed by the Third, Sixth, Eighth, Tenth, and Eleventh Circuits with the "traditional equitable criteria" method. *See generally* Leslie A. Fahrenkopf, *Striking the "Just and Proper Balance". A Call for Traditional Equitable Criteria for Section 10(j) Injunctions,* 80 VA. L. REV. 1159 (1994).

The court will, of course, endeavor to apply the law of the Court of Appeals for the Sixth Circuit in deciding this case.

### III. ANALYSIS

The NLRA, like all products of a democratic process, is imperfect. It has, nevertheless, served this country well in its promotion of collective bargaining and its protection of union efforts to improve the circumstances of working women and men by helping them to consolidate and wield economic power. The Act has been one of the bulwarks of our society's prosperity and, indeed, social order, during the last two-thirds of this century.

### A. The 10(j) Injunction

Section 10(j) [6] (unlike section 10(1)) of the Act, makes the existence of a Board Complaint a prerequisite to relief. Although the express words are not present in section 10(j), it would seem a natural reading of its provisions that any relief sought by the Board under this section would be to enjoin the very illegal behavior alleged in the Complaint and to restore the status quo ante if possible. The illegal activity complained of in the Fourth Consolidated Amended Complaint (Complaint I) consisted principally of allegations that the *News* and the DNA had violated section 8(a)(5) of the Act by failing to bargain in good faith. Ultimately, the ALJ found 8(a)(5) violations in his Decision and Recommended Order and upon these findings recommended to the Board certain rem-

6. Section 10(j) provides,

The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j).

edies, including the reinstatement of the replaced strikers.

■ The Board's Petition upon which it seeks relief in this case, however, is based solely upon the Complaint of the General Counsel (Complaint II) issued as a result of an unfair labor practice charge filed February 24, 1997, alleging that the newspapers' failure to reinstate former strikers was, in itself, a violation of 8(a)(3) of the Act, which forbids discrimination against employees for exercising rights guaranteed by section 7 of the Act.

The court accepts, as it believes it must, the Board's assertion that its request for 10(j) relief is based only upon the newspapers' refusal in February 1997 and thereafter to reinstate former strikers and to displace replacement workers if necessary. This basis for 10(j) relief presents the Board with two substantial difficulties:

(1) The refusal to reinstate former strikers immediately is not, by itself, a violation of established law. It is only a violation if the strike was an unfair labor practice strike. Its illegality is therefore derivative of the determination that an unfair labor practice (or practices) was (or were) committed and had some part in causing or prolonging the strike. It is an ancillary type of illegality dependent upon adjudication of other unfair labor practice issues.

(2) Most of the reported decisions which discuss the proper goals of 10(j) relief assert or presume that relief, as far as possible, should return the parties to the status quo ante at the time of the commission of the unfair labor practices which form the basis of relief, in other words, as to Complaint II, the status quo existing in February 1997, when, after unconditional offers to return to work, the newspapers refused to reinstate the former strikers. *See, e.g.,*

*Kobell v. United Paperworkers Int'l Union,* 965 F.2d 1401, 1410 (6th Cir.1992) (stating that definition of "status quo" is the condition "existing prior to the adoption of the allegedly unfair labor practice"); Pet.'s Proposed Findings of Fact and Conclusions of Law at ¶ 10 (identifying the status quo the Board seeks to maintain).

Consistent with these two obstacles to the court's granting the relief sought by the Board, the Board's Section 10(j) Manual identifies fifteen (15) different situations [7] as ones which might be suitable for the Board to petition a court to use its extraordinary equity powers to enjoin unfair labor practices. While these fifteen situations are not intended to be all-inclusive, they do say much about the thinking of the Board about the "proper" use of 10(j) prior to its determination to seek relief in this case. None of these fifteen situations are descriptively analogous to the facts here. Insofar as they describe the enjoining of employer (as distinguished from union) unfair labor practices, they focus principally on employer illegal activity which has allegedly vitiated the majority of new or weak unions or in other ways attacked or undercut the union's status as exclusive bargaining agent.

The court's belief that the Board's Petition departs from established practice and the discernible purposive intent of Congress at enactment is supported by the fact that neither the parties nor the court could discover any precedent where the Board sought section 10(j) injunctive relief in circumstances similar to those here. This conclusion is further confirmed by the declaration of former NLRB General Counsel Jerry M. Hunter, who states that using a charge such as that in Complaint II as the basis for 10(j) relief is "contrary to prior Board practice" because the charge in Complaint II does not "provide an independent basis for a violation

---

7. The fifteen categories are 1) interference with organizational campaign (no majority); 2) interference with organizational campaign (majority); 3) subcontracting or other change to avoid bargaining obligation; 4) withdrawal of recognition from incumbent; 5) undermining of bargaining representative; 6) minority union recognition; 7) successor refusal to recognize and bargain; 8) conduct during bargaining; 9) mass picketing and violence; 10) notice requirements for strikes

or picketing under sections 8(d) and 8(g); 11) refusal to permit protected activity on property; 12) union coercion to achieve unlawful objective; 13) interference with access to Board processes; 14) segregating assets; 15) miscellaneous (includes injunction against certain lawsuits, employer violence, interference with employee activities for mutual aid and protection). NLRB Section 10(j) Manual at 4 (revised July 1996).

of the Act," but "depends entirely on the ultimate outcome of the cases that were tried before Judge Wilks" (Complaint I). Hunter Decl. at ¶ 19. According to Hunter, a trial of the charge in Complaint II "would be much closer to a compliance proceeding, and the Board cannot proceed with compliance until there is an ultimate ruling on the merits of the cases that were tried before Judge Wilks." *Id.* Hunter further asserted that, in the present case, "The General Counsel could have sought authorization from the Board at any time after issuing [Complaint I] ... to seek Section 10(j) relief, including an order requiring reinstatement of strikers upon an unconditional offer to return to work." *Id.*

### B. Hiring of Replacements

Part of the economic weaponry given by the law to an employer in an economic employment dispute (one not caused or prolonged by unfair labor practices) is the ability to "permanently" replace striking workers. To do this, to propose to do this, to threaten to do this, when a strike seems likely or is actually in progress, is indeed, at least to strikers, one of the most odious and inflammatory uses of an employer's economic weaponry. The well-advised employer contemplating its use should think long and hard about its immediate and long-term impact on the employer's relationship with its union-represented employees (and, for that matter, its unrepresented employees). But that it is a legally permitted form of economic weaponry is beyond serious dispute. See *NLRB v. Mackay Radio & Telegraph Co.,* 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938) and its progeny.

Organized labor, of course, recognizes this and has for some time sought legislation to remove this sixteen-inch gun from the employer's legally sanctioned arsenal of economic weapons. *See, e.g.,* H.R. 4552, 100th Cong. (1988) (proposing to amend the NLRA to make it an unfair labor practice to hire or threaten to hire permanent replacements during the first ten weeks of a strike); H.R. 1383, 101st Cong. (1989) (same). However, organized labor has thus far failed in its efforts to make the permanent replacement of economic strikers illegal.

■ To say that the replacement of economic strikers is among an employer's economic rights is not, of course, to say where, when, or if, this heavy weapon should be used. However, without more, it is not an unfair labor practice to refuse to reinstate economic strikers who have been "permanently" replaced. Those workers are entitled to preferential hiring when vacancies exist, not to immediate rehiring. If, as the Board has alleged in Complaint I in this case and as the ALJ has found, the strike was caused or prolonged in whole or in part by unfair labor practices, the strikers, upon an unconditional offer to return and final adjudication, are legally entitled to reinstatement to their old jobs, displacing, if necessary, any "permanent" replacements.

To summarize, the Board here seeks injunctive relief pursuant to Complaint II, which posits that the refusal to comply with the AL's recommended reinstatement remedy (for the violations of the law he found under Complaint I) is *itself* an unfair labor practice deserving of the use of the injunctive powers of the court under the authority of 10(j).

The court concludes, as a matter of law, that section 10(j) cannot and should not be so used.

### C. "Reasonable Cause"

Because the unfair labor practice charges upon which Complaint II (and the Petition for relief here) is based cannot stand apart from the survival on review of the ALJ's finding of illegal activity based on Complaint I, the conclusion follows that the Board has not carried its burden of demonstrating "reasonable cause," even against a "relatively insubstantial" standard. *See Gottfried v. Frankel,* 818 F.2d 485, 493 (6th Cir.1987) (noting that the Board's burden of demonstrating "reasonable cause" is "relatively insubstantial"). In other words, the Board cannot show "reasonable cause" that the newspapers have committed an unfair labor practice in this case, because the refusal to reinstate striking workers is not an unfair labor practice without a final adjudication that the strike itself was an unfair labor

practice strike. This is not to say, of course, that the use of 10(j) interlocutory injunctive relief is not appropriate when it is sought to enjoin ongoing illegality alleged with "reasonable cause." Here it is the *remedy* for that not yet fully adjudicated alleged illegality which the Board asks the court to enforce.

### D. "Just and Proper"

The precedent of the Court of Appeals for the Sixth Circuit, along with a number of other circuits, gives the court a different, and narrower, scope of discretion in 10(j) cases from that of an equity court exercising its traditional review of a request for injunctive relief. *Compare Calatrello v. "Automatic" Sprinkler Corp. of America*, 55 F.3d 208 (6th Cir.1995), *and Pascarell v. Vibra Screw*, 904 F.2d 874 (3rd Cir.1990), *with Kinney v. Pioneer Press*, 881 F.2d 485 (7th Cir.1989), *and Miller v. California Pacific Med. Ctr.*, 19 F.3d 449 (9th Cir.1994). The parties have argued a number of bases for consideration which the court does not believe appropriate under the law of this circuit.

The court has *not* taken into consideration the arguments concerning:

1. likelihood of success on the merits (except as it may be implied from the discussion of "reasonable cause");

2. financial impact on the newspapers, *vel non;*

3. strike violence (or the doctrine of "unclean hands");

4. the asserted quality of the replacement workers as newspaper assets;

5. the assertedly higher percentages of women, minorities, and Detroiters among the replacement workers; and

6. the publication of the *Detroit Sunday Journal.*

The court concludes, however, that such factors, if considered, would weigh substantially in favor of a denial of the requested relief.

The court *has* considered whether, and how, the circumstances of this case relate to the possible frustration of the Board's remedial powers,[8] with particular attention to the Board's assertion that a failure to grant the injunctive relief prayed for would

1. erode union support;

2. scatter former strikers; and

3. promote or create an enhanced impediment to bargaining.

Both as to the possible erosion of union support and scattering, which are, of course, closely related, the court finds that no additional legally cognizable enhancement of these impacts will occur in the absence of injunctive relief after a strike already two years and one month old. No order of the court will predictably repair erosion and scattering which has occurred to date. The court does not recognize that speculating about further erosion and scattering can be a basis for concluding that failure to grant an injunction will frustrate the remedial powers of the Board.

The court further finds that the failure to grant injunctive relief will not frustrate the Board's remedial powers by creating or enhancing impediments to bargaining. The parties have continued to bargain throughout the strike and remain unable to agree on hundreds of issues. The Board has not provided evidence that the reinstatement issue has impeded bargaining progress.

Finally, and for all the above reasons, the court finds that a grant of the requested injunctive relief, because it is not "just and proper," would not serve the public interest.

The court adopts sections I (Background) and III (Analysis) of this opinion as its findings of fact and conclusions of law.

### IV. CONCLUSION

Was the strike against the newspapers an unfair labor practice strike, or not? That is the question the appropriate process must answer, and answer affirmatively and finally, before it can impose the remedy sought here, reinstatement of former strikers, displacing replacement workers if necessary.

---

8. *See, e.g., Gottfried v. Frankel*, 818 F.2d 485, 495 (6th Cir.1987) ("[T]he appropriate focus is on whether it is necessary to return the parties to status quo pending the Board's proceedings in order to protect the Board's remedial powers under the NLRA, and whether achieving the status quo is possible.").

The Board has had unfair labor practice charges before it in this case since even before the strike commenced, more than two years and one month ago. The Board's ALJ had the matter before him from October 1996 (the close of trial) to June 1997, almost a full gestation period, before ruling and recommending an order to the Board. The Board now asks the court to plunge into this difficult and, in many ways, tragic, labor dispute and impose a final remedy two weeks after the case was submitted to it at oral argument.

Not good process. And not an appropriate use of section 10(j), and therefore not, as the court has ruled, "just and proper."

The Board should expedite its review of this matter. It can be done. The reviewing court of appeals, if there is one, should also deal promptly with the issues brought to it. Only then should a remedy be imposed, if one is appropriate.

Not now.

### V. ORDER

Consistent with the above, the Board's request for injunctive relief is **DENIED**; and the Board's motion to amend its Petition is **DENIED AS MOOT**. The Board's Petition is **DISMISSED**.

**SO ORDERED.**